Good morning. My name is Gerald McFadden. I represent Juan Amarra. I'd like to address the court, the issue of the, as raised on the motion to dismiss the, on the basis of an illegal deportation. I'm sorry, could you speak up a little? Yes, yes, sir. I wish to address the issue of the motion to dismiss the indictment based upon the illegality of the underlying deportation. First, I'd like to point out that a factual issue had arisen between the defense and the government in the briefs based upon a disagreement as to what the nature of the allegations were in the order to show cause. That's been clarified by an errata which was filed by the government, which then makes clear that the argument that 212H of the immigration statute is applicable to the issue which is presented to the court. The two issues which are principally joined in the brief is the question of, first by the government contending that even if extreme hardship could have been determined by an immigration judge in this case, that the defendant could not have been eligible for relief based upon. I'm confused about something. Yes, Your Honor. The briefs were a little difficult for me because there were nine issues. Yeah. An unusually large number. Could you shoot your best shot first? What do you think your best one or two issues are? I am proceeding with the issue which I wish to argue to the court. That is the motion to dismiss the indictment. Which is really based upon the claim that the underlying deportation was defective, right? Yes, Your Honor. And it is undisputed that Mr. Amara, in the context of the immigration proceeding, was not advised of his right to seek relief under 212H. It's then clear under this court's case law that if indeed Mr. Amara established prejudice in the context of a motion to dismiss the indictment, that he would be entitled to a dismissal of the indictment. Before getting to the question of extreme prejudice, the government has argued that the defendant would not have been eligible for relief even if he had established extreme hardship because he would not have had a visa immediately available to him based upon a visa bulletin which was presented to the court giving a date possibly two years after his deportation when a visa would have been available. I have tried to read that visa bulletin. Why isn't the failure to advise him okay because he wasn't eligible for 212 relief and because he wasn't – he was not only a felon, but also he entered without inspection? Well, Your Honor, the government does not dispute that there are other bases for relief from deportation if the only allegation as to an individual is entry after inspection. There's another form of relief if he's paroled into the country or inspected and admitted, but that's not true either. The – well, Your Honor, in the context of – How could he get relief is what I'm asking. Pardon, Your Honor? You're saying it was defective because he wasn't told about the kind of relief he could get, but I can't figure out what kind of relief he could get or would get. His OSC charged him with the conviction of a second-degree robbery under California law. The – at the time of his deportation proceeding, he was eligible for relief from deportation upon a showing of extreme hardship based upon that felony conviction under 212H of the Immigration Code. Not having been advised of that under the case law then, he's entitled to bring a motion to dismiss the indictment. And if he could show extreme prejudice and could show that he could have been provided with a visa by the Immigration Service, he would have established a basis to dismiss the indictment. The government's argument with respect to not having a visa available, as I was saying, I cannot state as a fact that that is true. Not being able to read that visa bulletin and not being discussed in court because it was all provided at the last minute, and I don't think any real exchange took place upon it, because obviously defense counsel had not seen those papers. But the district court also did not rely upon it. But even if that was also – there's no response to the government, by the government, to the possibilities that Mr. Amara could have been paroled until he was eligible for the immigrant visa, that they could have continued the hearing until he was available, or there could have been a discretionary decision not to continue with the removal. As to the extreme – I thought he had to be – in order to get the 212 relief, his deportation had to be based on particular types of crimes, and he had the wrong kind of conviction for it. No. Based upon the errata which the government has provided to the court, after the briefs were filed, he did have that kind of a conviction. I see. The – there was a misunderstanding as to what the contents were of the OSC when the government filed its initial answering brief. And that's been clarified by the OSC, which provided in the errata to their ESR subsequently filed at this court. Proceeding then to the question of the showing of extreme hardship, the – it is the defense position that the district court applied the wrong standard altogether. The district court, I think it's apparent based upon the face of this decision, essentially said that if it was an immigration judge hearing his application, it would decide that he didn't have sufficient contact or closeness with the family, and the – he would not grant relief himself. But that is not the basis on which the court – the standard on which the court's case law, on which the district court should decide the case. If a defendant – What was the extreme hardship that he might have gotten relief for? The extreme hardship in this particular case was that to his father, who was a lawful permanent resident, who had provided an affidavit, which is in the excerpt of the court's record. The most also applicable hardship is that to his two United States children, both of whom were United States citizens, ages I think two and six months at the time. And what was he doing for his father and his children that it would be a hardship if he went to Mexico? The father – he wouldn't be going to Mexico, Your Honor, which is one of the issues here. He would be – he went to El Salvador. The mother of his children was from Guatemala. And – The children's mother is in Guatemala? Pardon, Your Honor? The children's mother is in Guatemala? No, she was born in Guatemala. She was a lawful permanent resident at the time. The mother has a green card. She's raising the children in the U.S. That's right. And both children are United States citizens. And what is the hardship to the children and the father if he goes to El Salvador? Well, the conditions in El Salvador were extremely bad in February of – Yeah, but it's not the children and the father that will be going there. The mother. Well, the father will be going there. I mean, it's not the children and Amara Herardi's father who would be going to El Salvador. One of the issues – And the hardship has to be to them, not to him. I agree with Your Honor, which was why I was pointing out that both the mother is from Guatemala, as well as the father, the defendant being from El Salvador. If family unity is going to continue in that context upon his deportation, they would have to decide to take those children to either Guatemala or El Salvador. Both of those countries were in extreme distress as of February of 1997. And that, under this court's case law, is a relevant factor with respect to the children and the hardship to the children and the question of family unity. That is not addressed by the district court judge, nor has it been addressed by the government. In addition, as to the father, who is also from, of course, El Salvador, his wife had died shortly before Mr. Amara's deportation, and Mr. Amara was, according to his declaration, a great benefit to him in connection with keeping his family together, which consisted of four other children in addition to Mr. Amara. I see I have one minute left, if I may, I'd like to reserve that time. Thank you, counsel. Good morning, Your Honors. My name is Kevin Mulcahy, and I represent the United States in this matter. I'll pick up where counsel left off regarding hardship of Mr. Amara. The hardship of Mr. Amara. When you say Mr. Amara, you mean the defendant's father? I'm sorry. Mr. Amara's claim of hardship. All right. Could you explain how we get there? Because I'd understood. I think I missed the errata or whatever. But could you just take us back and give us the government's framework under which we're analyzing this in relation to Section 212? Yes, Your Honor. The defendant was deported for two reasons. One, he entered the country without inspection. And two, he had a felony conviction. His only claim of relief that he could have from deportation would come from Section 245. The only claim of relief is 245A. 245A requires that a defendant be not ineligible for the United States. How we get to 212H is that one of the bases that Mr. Amara, the defendant here, was inadmissible was based on the prior conviction. 212H could, from an immigration standpoint, forgive that conviction and, therefore, relieve him of deportation for that reason only. He would still have to address his other reason for being deported, which was that he entered without inspection. So we get to 212H as one of the elements of 245A. And what the government lays out in our brief, and counsel's right, and I do apologize to the court, there was submitted with our original packet was the trial version, which had been redacted, of the OSC as opposed to the OSC in its full form. But that was submitted as part of the errata. Our argument comes down to this. The defendant had no basis for relief. There was no way he could have stayed in this country at the time of his deportation hearing, 212H notwithstanding, even if Your Honors find that Judge Jones erred in finding a lack of extreme hardship under 212H. And that's because of the other elements of 245, those being, as Judge Kleinfeld alluded to, the fact that the defendant was in the country after being inspected and admitted or paroled. There is no dispute that he was not, this defendant was not inspected and admitted or paroled. He came in surreptitiously. He must apply for the adjustment of status, which he did not. And this isn't an application like a job application. This is, requires birth certificates, fingerprint cards, a visa petition, waivers, all waivers of inadmissibility including 212H, and a $1,000 fee. So basically, because he snuck in, he could never have gotten the hardship relief. Not under 245. And not hardship relief, but 245A. If there's some other claim out there, the defendant hasn't made it. I don't know what it is. But under 245A, surreptitious entry is, excuse me, entry being lawfully admitted, or not even lawfully, but inspected and admitted or paroled. And lastly, and most obviously, a visa must be granted. A visa must be immediately available to him. Now, I know counsel argues there's no reason, we don't know that the court couldn't have continued the matter, allowed him to sort of wait it out. But that would go against the plain language of the statute, which requires the immediate availability. A visa being immediately available. That would read immediately right out of the statute, if all of the individuals who are facing deportation hearings could sort of wait around until their visa came up. Once we do get to the 212H and we talk about extreme hardship, Judge Jones. A limited number of visas per year. Correct, Your Honor. Obviously, there are more people that want to come to this country than we are able to take. And so, folks have to wait. With regard to 212H, as one of the reasons for his inadmissibility, Judge Jones did find that he lacked extreme hardship. And I know counsel brought up that there were declarations of the father of Mr. Amara. And with all due respect, I don't think Mr. Amara, I don't think there was hardship with the father. The father, according to Mr. Amara's pre-sentence report, which Your Honor said before you, was an abusive alcoholic. Beat his mother and beat him. We don't really even have to reach that question, though, do we? We don't. We don't even have to reach extreme hardship. And I want to make one other point clear, and I'm not sure that it really matters, but the defendant himself is actually from Guatemala. His wife was born in El Salvador. And so, the defendant's family is Guatemalan. His wife is El Salvadorian. And in their declarations, the mother and Mr. Amara, the defendant here, don't talk about relocation pains to Guatemala. They talk about separation pains. And that's another distinction here. What we have, essentially, when it comes to extreme hardship, is an individual who is a brother, who is a father, and who is a son. But he's not an exceptional one in any of them. There's no extreme hardship shown here. In fact, as it relates to his other siblings, the defendant brought his brother along when he committed vehicle theft and then ran from the police at over 100 miles an hour in a car. And when he's been arrested, not when he was arrested in 1996 for robbery, he claims to be his brother. He uses his little brother's name to identify himself. This is hardly a role model. This is hardly someone. To put it another way, I think Mr. Amara's brother is better off in not in this country. Do you mean the government, do you oppose an Ameline remand? No, Your Honor. I think because the defendant raised the issue in the last issue here in his brief, I think an Ameline remand is appropriate. There are a series of other issues, as Your Honor has noted, and I think I've responded to the first issue in full. Are there other questions regarding perhaps the sentencing or the failure to continue the matter for a new change of counsel? Not for me. After any other questions, then I'll submit it on the brief. Thank you, counsel. Thank you, Your Honor. Thank you. I would just like to point out that as to the question of illegal entry, that was not raised below the entire dispute and briefing and argument took place based upon the robbery in 212-H. I'd also like to point out that there are bases for relief of that. That's the most common kind of relief which is granted, and much of this Court's case law would be completely meaningless if, indeed, an illegal entry precluded relief of a direct felony, which then was disputed under 212-H. As to the immediacy of the visa availability, although it may not please the government, parole is clearly stated in 212-H. Continuance of hearings are commonplace in immigration proceedings, so that is not a bar to the possibility that he could have gotten relief. As to extreme hardship, the government may agree with Judge Jones that if they had the call, they would deport this person. But that's not the standard. That's not the standard. And a reasonable immigration judge, based upon this person's equity, could have granted him relief. Thank you, counsel. United States v. Samara Herardi is submitted.
judges: Kleinfeld, Tashima, Fisher